■ JOSE MONTAS, Appellant, v JJC CONSTRUCTION CORPORATION et al., Respondents. [939 NYS2d 354]—

Plaintiff alleges that he sustained personal injuries when he stepped over a piece of wood and slipped on "sand and construction debris" as he was crossing the street with his cousin. Approximately three or more feet to plaintiff's right, separated by a six-ton concrete barrier and chain link fence, was the City and

JJC Construction's work site for a project to remove the existing Grand Concourse bridge over East Tremont Avenue and erect a new one, which, among other things, required removing and carting away the old concrete and replacing it with new concrete. Approximately 5 to 10 feet in front of plaintiff was a sidewalk bridge adjacent to a building that, according to JJC's president, was undergoing brick pointing work.

After the close of evidence, the trial court granted defendants' motions for a directed verdict, finding that the testimony of plaintiff and his cousin that the sand on which plaintiff slipped was generated from the cutting and chopping of concrete for the roadway project was "more suggestion than proof," and was insufficient in light of the defense testimony that the roadway project used brown mason sand and that the white sand on which plaintiff slipped was blown over from the pointing project.

Contrary to the dissent's view, the trial court did not improperly make credibility determinations or decide factual issues when it granted defendants' motions. Rather, it correctly determined that plaintiff's self-serving testimony that JJC's concrete-chopping activities were the source of the greyish-white sand in the street on which he slipped was too speculative to raise an issue of fact.

It was plaintiff's initial burden to show that "defendant's negligence was a substantial cause of the events which produced the injury" (*Derdiarian v Felix Contr. Corp.*, 51 NY2d 308, 315 [1980]). " ' "Where the facts proven show that there are several possible causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable and probable that the injury was the result of one cause as the other, plaintiff cannot have a recovery, since he has failed to prove that the negligence of the defendant caused the injury" ' " (*Lynn v Lynn*, 216 AD2d 194, 195 [1995], quoting *Ingersoll v Liberty Bank of Buffalo*, 278 NY 1, 7 [1938]). "Even when there is no requirement for the plaintiff to exclude every other possible cause other than a defendant's breach of duty, 'the record must render the other possible causes sufficiently remote to enable the trier of fact to reach a verdict based upon the logical inferences to be drawn from the evidence, not upon speculation' " (*McNally v Sabban*, 32 AD3d 340, 341 [2006], quoting *Lynn*, 216 AD2d at 195-196).

Plaintiff testified that he knew he slipped on sand because he felt it underneath his foot when he fell down. However, he did not introduce into evidence a sample of the sand on which he slipped. While plaintiff testified that the sand was the result of

the chopping of concrete on the roadway project, he conceded that he never worked with concrete or did road work. Plaintiff and his cousin also conceded that they never did any pointing work and that they were not familiar with the dross it created.

Plaintiff's cousin admitted on cross examination that he did not know if the sand residue came from inside or outside the fence surrounding the roadway project. While he speculated that it "could be" that it came from inside the fence, he conceded that he did not know what material plaintiff slipped on. The City's project engineer, called by plaintiff as part of his direct case, testified that there was another project in the vicinity, that he could not identify the substance on which plaintiff slipped, and that he had not received any complaints about debris on the street that came from JJC's work site. JJC's president testified that the whitish material on which plaintiff slipped was created by the pointing work. While plaintiff and his cousin both testified that they did not see any work being done on the building adjacent to the sidewalk bridge, plaintiff testified that for the most part he and his friends would gather in the area after 5:00 P.M. or 6:00 P.M. His cousin testified that he was not in the area between 9:30 A.M. and 5:00 P.M.

Thus, the facts show that it is just as likely that the accident was caused by debris from the pointing project as by debris from the roadway project, and any determination by the trier of fact as to the cause of the accident would be based upon sheer speculation (*see Siegel v City of New York*, 86 AD3d 452, 455 [2011] ["(p)laintiff's unsupported assertion that it could have been defendants' conduit rather than that of Consolidated Edison or the water main break that caused the purported defect is mere conjecture and fails to raise a triable issue of fact"]; *Kimball-Malone v City of New York*, 7 AD3d 675, 675-676 [2004] [where plaintiff slipped and fell on gravel and sand while ascending flight of stairs in building undergoing renovations, appellant was entitled to summary judgment because "plaintiffs' contention that the appellant, or a contractor it supervised, created the dangerous condition was too speculative to raise an issue of fact"]). Concur—Andrias, Catterson, and Renwick, JJ.

Tom, J.P., and Acosta, J., dissent in a memorandum by Tom, J.P., as follows: Because there is evidence from which the jury could have found that defendants were negligent in permitting construction debris to accumulate on a pedestrian walkway and that such negligence was a proximate cause of plaintiff's injuries, it was error for the trial court to direct a verdict dismissing the complaint for failure to establish a prima facie

case. Furthermore, the resolution of factual issues by the court deprived plaintiff of his right to a jury trial.

In September 1999, defendant JJC Construction Corp., under contract with the City, was engaged in demolishing and reconstructing the Grand Concourse overpass and bridge over Tremont Avenue in the Bronx. This work entailed, inter alia, cutting and chopping out the existing concrete roadway, hauling the broken concrete and debris away in dump trucks, and replacing the roadway. The construction area was separated from the street by a six-ton concrete barrier, approximately three feet tall and topped by a wire fence. Plaintiff contends that he sustained injury slipping on sandy debris generated by JJC's demolition of the concrete overpass.

The dispositive issue in this matter is whether the sandy or gritty substance on which plaintiff slipped was the byproduct of the concrete-cutting and concrete-removal operations undertaken by the City's contractor, defendant JJC, as plaintiff alleges, or the cleaning and pointing of brickwork being performed by another, unidentified, contractor at a nearby building, as JJC maintains. The jury heard testimony in support of each theory.

On September 11, 1999, plaintiff and his cousin, Sergio Sanchez, were walking by the construction site when plaintiff noticed a large piece of "two by six" wood approximately five feet long lying on the ground next to the concrete barrier. As plaintiff stepped over the wood, his foot came down on "sand" or "sand and construction debris," causing him to slip and tear the anterior cruciate ligament and meniscus of his right knee. Both plaintiff and his cousin testified that there was a whitish or greyish material, as depicted in plaintiff's photographs, scattered about the ground in the vicinity of the barrier. Plaintiff frequently visited the neighborhood and was familiar with the area. He was aware of the construction project and had observed workers using "big machines" to cut and break up concrete slabs. Plaintiff testified that the sand and construction debris at the site of the accident had been generated by the cutting and chopping of the concrete and that the sand and debris from the demolition work went past the concrete barrier and onto the street where he fell. Plaintiff described the substance as sand and debris generated from the cutting and breaking of concrete.

Sergio Sanchez testified that he was familiar with the subject area since he walked past the site of the accident every morning on his way to work. He saw big "breaking machines" used to demolish the concrete slabs and stated that this work generated "a lot" of "dust." Sanchez saw plaintiff slip and fall over the sandy debris, the presence of which he had noticed at the location many times before the accident.

Plaintiff denied that the sandy substance on which he slipped was from brick pointing work at a nearby building, as urged by JJC, or from any source other than the construction site behind the concrete barrier. Sanchez, who waited at the construction site every day to be picked up and transported to his workplace, stated that he saw no work being performed on the nearby building either during the time he arrived at the pick up point at about 10:00 each morning or at the time he was dropped off at about 5:00 in the evening. For his part, plaintiff testified that he "never saw anyone work on that building. Absolutely no one."

Ohene Duodo, a project engineer, supervised the reconstruction project for the Department of Transportation, and oversaw the contractors. He testified that, as part of the reconstruction project, JJC was required to cut the concrete with a saw and then use a jackhammer or an excavator to break and remove the large chunks of concrete, which would then be hauled away in dump trucks. JJC was obligated to keep the work site clean and free of debris, even if it did not create that debris. JJC's duties included the removal of rubbish, debris, waste material, and wood as they accumulated. At a pretrial deposition, Duodo testified that materials used in the reconstruction project, including sand, were often deposited onto the roadway directly from delivery vehicles. He added that it was his practice to require the contractor to remove any sand or other debris from the roadway "whether he was responsible or not responsible because of our project." Duodo stated that he could not identify the material depicted in plaintiff's photographs. He stated that some of the material depicted in the photos could be seen "hanging on the wire mesh" above the concrete barrier. He concluded that the material depicted could be "many things" including "debris" and that "pure sand" "doesn't look like that." Duodo added that the sand used in city roadway construction projects is not white, like the substance depicted in plaintiff's photo. He further noted that during the time of plaintiff's fall, there was an ongoing pointing project on a nearby building, which was unrelated to the City's and JJC's work.

After plaintiff rested, defendants moved to dismiss the complaint. The court reserved decision, and the defense called Donald Zanfardino, the president of JJC Construction for the duration of the overpass reconstruction project. He testified that the sand used by JJC was yellow in color and that the company's responsibility for cleaning up the work site was limited to the area enclosed by the concrete barrier and adjoining fence and did not extend to the walkway beyond the barrier. This testimony was inconsistent with testimony given by Duodo.

From logs he maintained of the project's progress, Zanfardino recounted the work that was undertaken each day during the week preceding plaintiff's injury, which was sustained on a Saturday evening. On Friday, a concrete curb and rock had been removed from an area where a fire hydrant was to be installed. On the day of the accident, Zanfardino had recorded a log entry that read, "clean up concrete rock," which he explained referred to the remains of the concrete curb. Contrary to the testimony given by plaintiff and his cousin, Zanfardino stated that he had indeed observed work being performed at the nearby building, asserting that "they were re-pointing the brick work around the entire building." He described the mortar and cement mix being used as "a greyish material." Zanfardino asserted that the whitish material depicted in plaintiff's photographs was old mortar from the brick repointing project. Samples of materials employed in the City's reconstruction project were introduced into evidence to show the color of the sand that was being used.

After the conclusion of Zanfardino's testimony, the defense rested, and the court granted the dismissal motion on the record; the ruling was later reduced to the written decision and order from which plaintiff appeals. With respect to the cause of plaintiff's fall, the court found that Zanfardino "differentiated the grit on the ground from any sand or crushed concrete that was used in the JJC/City project." The court noted that "[t]he only evidence as to the source of the sand came from JJC's witness who testified that its white collar [*sic*] made it different from any material used in the renovation project, which was light brown or dark brown."

Assessing the relative strength of the evidence, the court continued, "Plaintiff's evidence was much more suggestion than proof regarding the source of the sand. This evidence was met by physical evidence, in the form of samples of the type of sand used in the project, as well as the testimony of JJC's witness, who placed another project at the site of the accident, and in describing the dross from the project, matched it to the cause of Plaintiff's fall." The court concluded that "there is insufficient evidence of causation to put this dispute before a jury." This was error.

A directed verdict pursuant to CPLR 4401 may be granted only "where the trial court finds that, upon the evidence presented, there is no rational process by which the fact trier could base a finding in favor of the nonmoving party" (*Szczerbiak v Pilat*, 90 NY2d 553, 556 [1997]). The evidence must be assessed in a light most favorable to the responding party and the benefit of every factual inference that may properly be drawn must

be accorded him (*id.*, citing *Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]). Where, as here, a matter is tried to a jury, the court lacks the power to make findings of fact and, thus, may not resolve any factual issue in deciding whether to direct a verdict (*see Cohen*, 45 NY2d at 498, citing *Middleton v Whitridge*, 213 NY 499, 506-508 [1915] [the power of a court to make factual findings is foreclosed by the constitutional right to trial by jury]). Thus, Supreme Court erred in resolving the central factual contention in this case.

As an initial matter, the samples of sand, introduced into evidence by JJC apparently with the intent to demonstrate that it was not the substance on which plaintiff slipped, is immaterial. As noted at the outset, the central issue in this case is whether the gritty debris alleged to have caused plaintiff to slip and fall was the result of the cutting and breaking of concrete by JJC or, alternatively, the removal of mortar from the adjacent building by some unidentified third party. The mason's sand that was used to mix new cement for use in the City's project was never implicated as the cause of plaintiff's injury, and its color and other characteristics have no bearing on this case.

The divergent testimony given by the different witnesses during trial merely serves to establish the existence of credibility issues that the trier of fact was required to resolve in making its findings. Plaintiff owned an "environmental construction company," which performed, among other things, interior demolition and renovation work. He testified that he observed "big machines" cutting and breaking up concrete slabs which generated "a lot of dust" and sandy debris that spilled from the site past the concrete barrier and onto the adjacent street where he slipped and fell. Likewise, Sanchez observed the accumulation of dust and sandy debris at that location on many occasions before plaintiff's fall. Plaintiff and Sanchez both testified that they had viewed the whitish dust and debris generated by JJC's concrete-cutting-and-breaking activities, and that the debris was on both sides of the concrete barrier next to the site of the accident. Indeed, Duodo testified that some of the whitish material depicted in plaintiff's photographs could be seen on the wire mesh above the concrete barrier.

In contrast, defendants point to the testimony of Zanfardino and Duodo that there was a brick-pointing project on the building behind the scaffolding visible in plaintiff's photos, and that this repointing project, not JJC's reconstruction work, was the source of the sandy material upon which plaintiff slipped. Zanfardino was the only witness to maintain that repointing work was actively being performed at the nearby building, and

his testimony was explicitly contradicted by the testimony of plaintiff and Sanchez. Zanfardino went to the site of the accident after plaintiff's fall and confirmed that there was debris there. However, he made no attempt to clean it because he determined that the debris was not from his project but was from the brick repointing work. Once again, his account was inconsistent with the testimony of Duodo, who stated that JJC would be directed to clean the debris on the roadway even though it was outside of the work site and regardless of whether it had been generated by JJC.

The trial court deprived plaintiff of his right to have this case decided by a jury (*Middleton v Whitridge*, 213 NY at 506-508) by usurping the jury's function and purporting to resolve, as issues of law (*see* CPLR 4401; *Cohen v Hallmark Cards*, 45 NY2d at 498), questions of credibility and issues of fact (*see Colozzo v LoVece*, 144 AD2d 617, 618 [1988]). The court further erred in drawing favorable inferences from the facts in favor of defendant, rather than in favor of plaintiff (*Cohen*, 45 NY2d at 499).

Although the trial court did not reach JJC's alternative argument that it was an independent contractor that had no duty to third parties, the testimony of plaintiff and his cousin, if credited, serves to establish liability on the ground that it was JJC that created the hazardous condition (*see Lewis v Metropolitan Transp. Auth.*, 99 AD2d 246, 249 [1984], *affd for reasons stated* 64 NY2d 670 [1984]).

The majority's analysis of this case is flawed. In concluding that defendant's action should be dismissed, the majority relies on this Court's ruling in *Lynn v Lynn* (216 AD2d 194 [1995]) to conclude that plaintiff's injury could just as likely have been caused by debris from the repointing work. The facts in *Lynn* are distinguishable, and its holding has no application to the present appeal. There, an 81-year-old plaintiff fell down a flight of stairs and commenced an action against the property owner. She contended that the stairway was defective and that there was inadequate lighting. As a result of the fall, the plaintiff suffered amnesia and was unable to testify as to the circumstances of the accident or the cause of her fall. Thus, she failed to meet her burden to establish prima facie that the owner's negligence was a proximate cause of the events that produced her injuries, and the owner was entitled to summary judgment in his favor. In stark contrast, plaintiff herein suffers from no amnesia, and based on the testimony and evidence adduced at trial, has made out a prima facie case that his injuries were caused by defendant's negligent maintenance of the construction site. In making a factual finding that plaintiff's injury could just as likely have

been caused by another source, the majority improperly condones the trial court's improvident intrusion into the jury's exclusive province to decide factual issues (*cf. Siegel v City of New York*, 86 AD3d 452 [2011] [summary judgment]; *McNally v Sabban*, 32 AD3d 340 [2006] [same]; *Kimball-Malone v City of New York*, 7 AD3d 675 [2004] [same]).

Viewing the evidence in the light most favorable to plaintiff, a finder of fact could rationally have found that the sandy debris upon which he claims to have slipped and fallen was generated by JJC's activities (*see Szczerbiak v Pilat*, 90 NY2d 553, 556 [1997]; *Sweeney v Bruckner Plaza Assoc.*, 57 AD3d 347, 349 [2008], *appeal dismissed* 12 NY3d 832 [2009]). The jurors could reasonably have credited the testimony of plaintiff and his cousin, based on their direct observations, that JJC's concrete-cutting activities were the source of the sandy debris. The testimony of defendants' witnesses that a nearby brick-repointing project was the source of the sandy debris merely raised a credibility issue for the jurors, who were free to reject that testimony (*see Matter of Nowakowski*, 2 NY2d 618, 622 [1957]; *Perez v Andrews Plaza Hous. Assoc., L.P.*, 68 AD3d 512 [2009]). The majority agrees with the trial court that plaintiff's testimony was self-serving. But if plaintiff's testimony concerning the cause of his injury can be considered self-serving, so too can Zanfardino's testimony denying liability. Once again, assessment of the credibility of witnesses is within the sole prerogative of the jury.

Finally, as a matter of procedure, the court improvidently decided the motion without first submitting the case to the jury. It has been noted by this Court that the better practice is to entertain motions for judgment as a matter of law only after the jury has returned a verdict, so that if an appellate court disagrees with the ruling, the verdict may be reinstated rather than remanding the matter for a new trial (*see Jacino v Sugerman*, 10 AD3d 593, 594-595 [2004]; *Vera v Knolls Ambulance Serv.*, 160 AD2d 494, 496 [1990]; *Matter of Austin v Consilvio*, 295 AD2d 244, 246 [2002]). As this Court pointed out in *Rosario v City of New York* (157 AD2d 467, 472 [1990], citing *Greenberg v Bar Steel Constr. Corp.*, 37 AD2d 162, 163 [1971]), "[u]nless it appears that the defendant's case will consume an inordinate amount of the trial court's time, the better practice is to submit the case to the jury which, in some instances, may obviate defendant's CPLR 4401 motion by returning a defendant's verdict." Here, the jury heard all the evidence, and the court reserved decision on the motion until both sides had rested. It would hardly have been an imposition on the court's time to

take the obvious next step of obtaining a jury verdict to avoid the potential waste of the time expended on the trial.

Accordingly, the order should be reversed and the matter remanded for a new trial.