**Roger DUGUAY, Plaintiff,**

v.

**CITY OF NEW YORK, F.J. Sciame Constr. Co., Inc., Baroco Contracting Corp., Manetta Indus. Inc., Manetta Enters. Inc., and Consol. Edison Co. of New York, Inc., Defendants.**

**No. 10 Civ. 739(NRB).**

United States District Court, S.D. New York.

March 20, 2012.

---

Bruce J. Cheriff, Esq., Cheriff & Fink, P.C., New York, NY, for Plaintiff.

John F. Gillespie, Esq., Ahmuty, Demers & McManus, New York, NY, for Defendants City of New York, F.J. Sciame Constr. Co., Inc., and Baroco Contracting Corp.

Thomas G. Vaughan, Esq., Jones, Hirsch, Connors & Bull P.C., New York, NY, for Defendants Manetta Indus. Inc. and Manetta Enters. Inc.

Vivian Dole–Merson, Esq., New York, NY, for Consol. Edison Co. of New York, Inc.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

### I.  Introduction

Roger Duguay (the "plaintiff") brings suit against the City of New York (the "City"), F.J. Sciame Construction Co., Inc. ("FJS"), Baroco Contracting Corp. ("Baroco"), Manetta Industries Inc. and Manetta Enterprises Inc. (together "Manetta"), and Consolidated Edison Co. of New York, Inc. ("ConEd") (collectively the "defendants"), seeking damages arising from an accident that he alleges was caused by the negligence of defendants.  Before the Court are two motions for summary judgment: one filed jointly by the City, FJS, and Baroco and one filed independently by Manetta.[1]  In addition to seeking sum-

---

1.  The only non-moving defendant remaining in the case, ConEd, has been indemnified by Manetta, which was acting as a subcontractor

mary judgment on plaintiff's negligence claim, both of these motions also seek summary judgment on the various cross claims asserted against each moving defendant by their co-defendants. For the reasons stated below, the City, FJS, and Baroco's motion is granted[2] and Manetta's motion is denied,

## II.   Background[3]

### A.   The Accident

On the afternoon of July 10, 2009, plaintiff was walking south along Madison Avenue with three of his relatives toward the Whitney Museum of American Art when he approached the northwest corner of Madison Avenue and 77th Street (the "northwest corner"). J. Defs.' R. 56.1 ¶ 1; Vaughan Aff. Ex. D ("Duguay Dep.") Tr. 19:20–20:5, 94:25–95:4. Arriving at the northwest corner, plaintiff waited for between five and ten seconds before the pedestrian traffic light illuminated. J. Defs.' R. 56.1 ¶ 2. Standing on the curb approximately eighteen inches over from the western boundary of the crosswalk that traverses 77th Street (the "crosswalk"), plaintiff stepped off of the curb and into the crosswalk with his left foot. Id.; Manetta R. 56.1 ¶ 9. As he stepped from the curb, plaintiff was looking south but did not look down to where his left foot would

land in the crosswalk. Duguay Dep. Tr. 20:15–22:24.

At his deposition, plaintiff explained that his "[left] foot went into a very uneven surface," which he believed "was deeper than what . . . the street should be." Id. at 20:11–14. In particular, plaintiff estimated that the depressed area on which his left foot landed was four to five inches below the level of the street. Id. at 97:1–10. Plaintiff's brother-in-law, Bruce Dyer ("Dyer"), who was one of the relatives walking with plaintiff, swears that he witnessed plaintiff step into this depressed area, which he states "was completely caked with dirt, asphalt[,] and cement," and that "[a]s soon as [plaintiff's] foot touched [down], he twisted his ankle and fell to the ground." Cheriff Aff. Ex. E ("Dyer Aff.") ¶¶ 1–3, 5. Having similarly stated at his deposition that his left ankle twisted underneath him and caused him to fall forward, plaintiff was asked, "Did you feel something under your left foot that caused your left ankle to twist?" to which he responded, "I don't recall exactly. I do know that there were some stones around, and I think I might have hit one of the stones. I hit some soft material. I can't be positive." Id. at 120:18–121:6. Falling onto the street, plaintiff's left hand and forehead hit the pavement. Id. at 23:20–

---

for ConEd at all relevant times. *See* Oral Arg. Tr. 33:12–18.

**2.**   Despite arguing in plaintiff's opposing papers against the City, FJS, and Baroco's motion as to each moving defendant, at oral argument on February 16, 2012, plaintiff's counsel acknowledged, "Baroco is not responsible. . . . [There is n]o dispute regarding Baroco." Oral Arg. Tr. 17:9–12. In response to the Court's later question, "you agree that Baroco is out of this [case]?" plaintiff's counsel nodded his assent. *Id.* at 21:23–22:1. We thus grant the motion for summary judgment as to Baroco on plaintiff's consent but still briefly examine on the merits the issue of Baroco's alleged negligence in light of Manetta's cross claims against Baroco. *See* Answer

to Third Am. Compl. ¶¶ 63–64 (pleading cross claims).

**3.**   The facts recited here are drawn from the following sources: (1) the Joint Defendant's Rule 56.1 Statement ("J. Defs.' R. 56.1"); (2) Manetta's Rule 56.1 Statement ("Manetta R. 56.1"); (3) Plaintiff's Response to the Joint Defendant's Rule 56.1 Statement ("Pl.'s First R. 56.1"); (4) Plaintiff's Response to Manetta's Rule 56.1 Statement ("Pl.'s Second R. 56.1"); (5) exhibits attached to the Affirmation of John F. Gillespie ("Gillespie Affirm."); (6) exhibits attached to the Affidavit of Thomas G. Vaughan ("Vaughan Aff."); and (7) exhibits attached to the Affidavit of Bruce J. Cheriff ("Cheriff Aff.").

24:8. Standing with the assistance of his relatives, plaintiff rested against a low construction barrier that was positioned beside the crosswalk. *Id.* at 24:12–18, 25:24–27:5. Rising from the construction barrier after a matter of seconds, plaintiff lost consciousness and again fell forward and according to Dyer struck his head on the curb. *Id.* at 26:18–27:10, 123:10–16; Dyer Aff. ¶ 5.

When plaintiff regained consciousness, his relatives helped him into a sitting position on the curb, approximately in the same place where he had earlier stepped off from the curb and into the crosswalk. Duguay Dep. Tr. 28:4–25. In particular, plaintiff testified at his deposition that he was sitting two feet from the western boundary of the crosswalk. *Id.* at 30:11–24. As he sat on the curb, plaintiff stated that his feet were resting in a depression roughly two feet by two feet with a "very uneven surface" composed of "a lot of dirt and debris and some trash, light small pieces of trash, "which he clarified consisted of" [b]its of paper." *Id.* at 29:1–30:7; J. Defs.' R. 56.1 ¶ 3. Plaintiff further testified that pieces of metal were visible on the far edge of the depression from the curb. Duguay Dep. Tr. 31:16–32:14. An ambulance soon arrived and brought plaintiff for treatment to a local hospital. *Id.* at 33:19–37:6.

During his deposition, plaintiff was shown photographs taken on the day of his accident that depict the northwest corner, and in two of these photographs, he circled a seemingly depressed area abutting the curb and within the crosswalk that appears filled with dirt and debris as reflecting the approximate area where his left foot landed when he originally stepped off the curb. *See id.* at 42:20–47:9, 51:14–53:18; Duguay Dep. Exs. 4, 7. During his deposition, plaintiff was also shown photographs taken five to ten days after his accident that similarly depict the northwest corner and a clear catch basin in the depressed area that in the earlier photographs plaintiff circled and that appeared filled with dirt and debris. *See* Duguay Dep. Tr. 44:2–6, 60:10–11; Duguay Dep. Exs. 1–3.

## B. The Catch Basin

According to George Crimarco ("Crimarco"), a construction laborer employed by the City's Department of Environmental Protection ("DEP"), a "catch basin" sits "in the street right off the curb to catch rainwater or ... water from an open hydrant, or if somebody [i]s ... washing the street down, [then] the water would come into the catch basin." Gillespie Affirm. Ex. P ("Crimarco Dep.") Tr. 8:12–17, 12:16–22. On the surface, the catch basin consists of a metal grating that is intended to be on a level grade with the surrounding street. *See id.* at 70:25–74:24. As Crimarco further explained during his deposition, water that enters the catch basin through this grating runs down to the sewer, either directly or via an inlet pipe, which in some cases connects to a well for excess water. *See id.* at 13:7–16, 61:15–62:8. Crimarco stated that a catch basin with an inlet pipe is not as deep and is more prone to becoming clogged. *See id.* at 15:20–16:6. Shown the same photographs of the catch basin in the crosswalk on the northwest corner previously shown to plaintiff, Crimarco identified the catch basin as an inlet pipe catch basin. *See id.* at 14:17–15:7, 15:14–19.

Prior to July 10, 2009—the day of plaintiff's accident—public records indicate that employees of DEP on a number of occasions visited the vicinity of the northwest corner to address issues relating to catch basins. It must be noted that there is more than one catch basin on the northwest corner: one catch basin, depicted in the photographs shown to plaintiff and Crimarco, sits in the crosswalk on the north side of 77th Street and the other catch basin sits around the corner on the

west side of Madison Avenue. *See* Gillespie Affirm. Ex. O ("O'Connell Dep.") Tr. 23:14–25:7 (discussing catch basin on Madison Avenue). To the extent that the public records often refer to a catch basin on the northwest corner there is thus some ambiguity as to which catch basin is referenced.

On October 19, 2007, a member of the public called to advise that the "catch basin located at [the] north west corner of [E]ast 77[th] [Street was] causing water ponding on rainy days." Cheriff Aff. Ex. G ("DEP Records") Ex. 11.[4] In response to this telephone call, on October 22, 2007, employees of DEP visited the site and recorded their observation that there was a construction site on the northwest corner and that some part of a catch basin was "filled with cement." *Id.*[5] On October 26, 2007, however, employees of DEP found that the "catch basin was taking water due to heavy rain." *Id.* Crimarco separately testified to the meaning of a catch basin "taking water," which phrase connotes that water is able to go down the catch basin to the sewer. Crimarco Dep. Tr. 35:11–21.

On April 2, 2008, a member of the public called to advise that there was a "SIN[K] HOLE [in front of] THE MARK B[uilding] 5 [feet] WIDE and 1 FOOT DEEP NEAR GRATING ON CATCH BAS[I]N."

DEP Records Ex. 8.[6] On May 16, 2008, a member of the public separately called to advise that there was a "FLOODING ROADWAY AT [the] INTERSECTION" and that there was also "WATER OVER-FLOWING ... ONTO [the sidewalk]." DEP Records Ex. 6. In response to these telephone calls, employees of DEP visited the vicinity of the northwest corner on at least May 2, 2008, May 5, 2008, May 17, 2008, and May 20, 2008. *See* DEP Records Exs. 6–10, 12. During these visits, the catch basin "on [the] north west corner" was cleaned and flushed, however cement was discovered in the well and inlet pipe of the catch basin on the "north side of East 77[th] [S]treet" and could not be penetrated. DEP Records Ex. 9. *See* Crimarco Dep. Tr. 55:25–57:13, 62:14–66:2. There is no indication from the records relating to the two reports received in April and May 2008 that employees of DEP confirmed the existence of a sink hole let alone repaired or attempted to repair one.

On April 3, 2009, a member of the public called to advise that "THE CATCH BASIN AT THE [intersection of Madison Avenue and 77th Street] IS CLOGGED WITH DEBRIS DUE TO [a] CONSTRUCTION SITE." DEP Records Exs. 1–5.[7] On April 4, 2009, an employee of

---

4. During his deposition, Crimarco conveyed that where *information for the duration of a* call was not provided, the call originated with a "consumer," which he later clarified could be any member of the public. *See* Crimarco Dep. Tr. 17:5–18, 75:9–13. It appears that such calls were at least sometimes received by DEP via the City of New York's "311" telephone hotline. *See id.* at 74:16–24.

5. Crimarco stated that employees of DEP contemporaneously record observations in the field, which their supervisors subsequently enter into electronic records—the original handwritten records are separately archived. *See* Crimarco Dep. Tr. 22:20–23:19.

6. As discussed below, *see* Part II. C *infra*, the Mark Hotel stands on the northwest corner.

7. It appears that a subsequent call was placed directly to DEP by Francisco Santos, a construction representative employed by ConEd, who oversaw Manetta's work in the vicinity of the northwest corner and who observed a flooded catch basin on one occasion. Aware of complaints from the Mark Hotel regarding this clogged catch basin, Santos called an acquaintance at DEP to inquire whether a crew could be dispatched to address the issue. *See* Vaughan Aff. Ex. G. ("Santos Dep.") Tr. 30:17–24, 63:13–65:20, 74:22–76:24. At his deposition, Santos testified that employees of DEP arrived to inspect the catch basin on

DEP inspected the northwest corner as well as the southwest corner of the intersection and determined that an inlet pipe of a catch basin on the northwest corner needed to be flushed. Crimarco Dep. Tr. 21:22–22:2. *See also* DEP Records Ex. 5. On April 6, 2009, employees of DEP arrived with a "flusher" truck and attempted unsuccessfully to clear the obstructed inlet pipe with water pressure from a hose. Crimarco Dep. Tr. 22:3–8, 24:7–12, 27:8–23. *See also* DEP Records Ex. 5. As part of this exercise, Crimarco testified at his deposition that the grating of the catch basin would have been removed and cleaned. *See* Crimarco Dep. Tr. 27:24–28:22. On June 24, 2009, employees of DEP again visited the site and hydrant flushed a catch basin at the southwest corner and possibly also the northwest corner. *Compare* DEP Records Ex. 5 (stating "hydrant flushed south west corner north west corner under construction zone at this time, taking water" and "[h]ydrant flushed s/w/c, n/w/c at under construction zone at this time") (punctuation in original) *with* Crimarco Dep. Tr. 35:5–10 ("they went out to flush hydrants on the southwest corner and also on the northwest corner"). During his deposition, Crimarco explained that hydrant flushing, which is apparently unrelated to the work of a "flusher" truck, is performed by opening an adjacent fire hydrant to test whether a catch basin is taking water. *Id.* at 35:11–36:12. While the public records plainly reflect that the northwest corner was "under [a] construction zone" at this time, it is not clear whether the catch basin described at the northwest corner was nonetheless also hydrant flushed on June 24, 2009–the proximity of the phrase "taking water" and Crimarco's deposition testimony suggest that it was hydrant flushed but the nota-

May 19, 2009, a day for which no accompanying public records have been identified. *See*

tion regarding the construction zone as well as separating punctuation tend to undermine this inference. DEP Records Ex. 5.

In all of the public records regarding the activities of DEP in the vicinity of the northwest corner prior to plaintiff's accident, no information is recorded that describes a condition relating to a catch basin as dangerous.

## C. The Construction Site

From approximately January 2007 to September 2009, the Mark Hotel, 25 East 77th Street, New York, New York, 10075 (the "hotel"), which sits on the northwest corner, was thoroughly renovated. Gillespie Affirm. Ex. K ("Primiani Dep.") Tr. 9:19–23, 12:20–13:3. According to Anthony Primiani ("Primiani"), who was employed during the relevant time period as a project superintendent by FJS, which served as the construction manager for the renovation, any construction debris located outside on the sidewalk was cleaned up with brooms and shovels and placed in containers inside the hotel. *Id.* at 8:4–6, 29:9–11, 40:3–25. With that said, Primiani also testified that during the roughly six weeks prior to plaintiff's accident employees of FJS and its subcontractors would periodically use garden hoses to clean "dust" from the sidewalk in response to complaints about dusty footprints from neighbors of the hotel or retail stores within the hotel. *Id.* at 41:11–44:2. The water used in washing away such dust would "[g]o into the street." Aside from this work to clean debris and remove dust, Primiani recalls two discrete projects during the renovation that impacted the sidewalk and street outside of the hotel. *Id.* at 10:8–18, 11:16–21.

Santos Dep. Tr. 63:22–64:3.

One of these two projects involved Baroco, a subcontractor to FJS, "replacing the existing sidewalk with new curbs and perimeter stone." *Id.* at 10:17–18; J. Defs.' R. 56.1 ¶ 7. However, Baroco only began to work on this project on July 9, 2009–the day prior to plaintiff's accident. J. Defs.' R. 56.1 ¶ 15. According to Timothy O' Connell, the owner of Baroco, on July 9, 2009, three employees of Baroco used a wet saw with a concrete blade to cut along the pavement of Madison Avenue approximately three to six inches from the curb, which they were intending to replace. O'Connell Dep. Tr. 5:19–23, 22:5–23:6; J. Def.'s R. 56.1 ¶ 15. The length of the cut ran from the northwest corner to less than half way up the block toward 78th Street, approximately the length of the hotel along Madison Avenue. O'Connell Dep. Tr. 23:7–24:6. The resulting cut in the pavement was approximately one quarter of an inch thick—the width of the wet saw's concrete blade. *Id.* at 24:17:20. The water and debris produced by the cut washed away into the catch basin at the northwest corner on Madison Avenue. *Id.* 24:21–25:4. The cut did not extend past this catch basin—the arc of the northwest corner itself was left for a subsequent phase of the project. *Id.* at 25:5–15. In fact, Baroco's permit for July 9, 2009 only covered work on Madison Avenue, not 77th Street. *Id.* Baroco did not perform any further work on the project until July 14, 2009. *Id.* at 24:13–16, 25:22–26:11.

The other of these two projects involved ConEd, which was not a subcontractor to FJS and which actually retained Manetta to install electrical vaults on 77th Street, work that required extensive excavation and backfilling on 77th Street and the sidewalk alongside 77th Street. Primiani Dep. Tr. 11:16–21, 16:13–19; Manetta R. 56.1 ¶ 5; Vaughan Aff. Ex. E ("Field Data Forms"). According to Doug Tinter ("Tinter"), a field supervisor employed by Manetta, this work was begun on May 18, 2009 and completed on July 11, 2009. Vaughan Aff. Ex. F ("Tinter Dep.") Tr. 14:19–15:12. In addition to excavating the sidewalk and street on the north side of 77th Street at points between Fifth Avenue and Madison Avenue in order to place electrical vaults, Manetta also excavated along 77th Street and into the intersection of Madison Avenue and 77th Street in order to place electrical conduits. *Id.* at 23:15–24:21, 27:20–25, 38:21–40:14. *See also* Field Data Forms. This excavation work involved the use of a backhoe and wet saw as well as hand digging with shovels, picks, and bars. Tinter Dep. Tr. 24:7–13, 40:8–14, 46:19–47:3. In the course of excavating, in addition to removing asphalt, concrete, and dirt, Manetta periodically encountered masonry items that required removal. *See* Santos Dep. Tr. 22:2–24:3; Field Data Forms 4–6. Once work beneath the level of the street or sidewalk in an excavated area was complete, Manetta would backfill the excavation, a process that involved a dump truck dumping dirt either into the excavation or onto the street beside the excavation from where a backhoe would move the dirt into the excavation. Tinter Dep. Tr. 35:2–37:7. As Tinter acknowledged at his deposition, he is unaware of which approach was adopted in the project and does not recall whether he was ever present during backfilling. *Id.* at 36:14–19.

The field data forms, on which employees of Manetta recorded their work completed on the project, provide detail regarding each of the twenty-six (26) "cuts" or excavations in the street and sidewalk, which in each case involved subsequent backfilling. *Id.* at 13:3–15; Field Data Forms. The field data forms reflect the implementation of a plan that was conceived prior to the commencement of the project and documented in a conduit work diagram. *See* Tinter Dep. Tr. 68:6–69:8; Cheriff Aff. Ex. M. Drawing on additional

information from daily log reports, which provide a narrative of the project's progress,[8] and apparently cross-referencing the conduit work diagram, plaintiff's counsel prepared in connection with plaintiff's opposing papers a summary of certain of the excavation and backfilling activities preceding the date of plaintiff's accident with particular reference to their proximity to the catch basin at the northwest corner on 77th Street:

| Date (s) | Excavation ("E") and/or Backfilling ("B") | Approximate Distance to Catch Basin |
| --- | --- | --- |
| 05.09.2009–05.21.2009 | E | 50 feet |
| 05.26.2009 | E | 60 feet |
| 05.27.2009 | E | 30 feet |
| 06.16.2009–06.17.2009 | E | 20–35 feet |
| 06.18.2009 | E and B | 45 feet |
| 06.23.2009 | E | 45 feet |
| 06.29.2009 | E | 5–15 feet |
| 06.30.2009 | E | 50 feet |
| 07.06.2009 | E | Not Stated |
| 07.07.2009 | E and B | 35 feet |
| 07.08.2009–07.09.2009 | B | 35 feet |

Pl's Second R. 56.1 ¶¶ 29–39.[9]

According to Tinter, at the end of each day, employees of Manetta swept up dirt and debris with brooms but never to his recollection employed hoses. Tinter Dep. Tr. 32:10–34:19. With regard to backfilling, Tinter specifically recalls that the same clean-up procedure involving brooms, shovels, and also a backhoe was followed. *Id.* at 37:8–38:2. Francisco Santos, a construction representative employed by ConEd, who oversaw Manetta's work, similarly recalls that at the end of the workday any dirt and debris was swept up with brooms and placed in the bucket of a backhoe, which loaded the accumulated waste into a dump truck. Santos Dep. Tr. 43:22–45:17. Like Tinter, Santos does not recall the use of hoses. *Id.* at 44:12–17. With that said, records of the project suggest that it rained on May 21, 2009, June 15, 2009, and June 18, 2009. *See* Field Data Forms 13, 16 (describing "heavy rain" on June 18, 2009); Cheriff Aff. Ex. L 3, 13. Both Tinter and Santos have no recollection of dirt or debris being swept towards the catch basin at the northwest corner on 77th Street. Tinter Dep. Tr. 42:10–14; Santos Dep. Tr. 45:8–17. Both men, however, also acknowledge that they were not present at all times that work was performed. *See* Tinter Dep. Tr. 9:15–17, 36:17–19; Santos Dep. Tr. 20:10–15.

While Tinter further has no recollection of even seeing this catch basin, Tinter Dep. Tr. 61:24–62:23, Santos remembers it and in particular the fact that it was flooded on one occasion and that he had called an acquaintance at DEP in light of complaints from the hotel about the catch basin clogging. *See supra* note 7. Primiani in turn

8. The daily log reports on which plaintiff relies appear to have been created by employees of ConEd who were supervising Manetta's work. *See* Cheriff Aff. Ex. L; Tinter Dep. Tr. 25:12–14, 45:17–25; Santos Dep. Tr. 19:3–10, 40:4–6.

9. It is clear from reviewing the field data forms that the summary provided by plaintiff's counsel is at the very least a partial account of the excavation and backfilling performed by Manetta and possibly highlights certain inconsistencies between the various pieces of documentary evidence bearing on the excavation and backfilling. *See, e.g.,* Field Data Forms 1–3 (detailing that certain "cuts" were backfilled on May 27, 2009, May 29, 2009, June 15, 2009, June 16, 2009, June 17, 2009, June 19, 2009, June 22, 2009 June 25, 2009, and July 1, 2009 in addition to the dates specified in the summary). However, in his short reply papers, Manetta's counsel did not dispute the facts contained in this summary, taking issue rather with plaintiff's counsel's characterization of them. *See* Manetta Reply Letter 2 (citing Pl.'s Second R. 56.1 ¶¶ 29–39 for the proposition that "most of the work performed by Manetta was between 35 and 60 feet away from the 'catch basin' " and asserting that "plaintiff's argument that Manetta performed work at the [a]ccident [l]ocation the day before the accident is disingenuous[ ] in light of plaintiff's own statement that this work was 35 feet away from the 'catch basin' "). We therefore accept these facts as uncontroverted for the purpose of deciding the pending motions.

recalls that he never saw this catch basin *unclogged* during the course of the renovation prior to July 10, 2009 and that multiple efforts by DEP to unclog it in 2007, 2008, and 2009 were all unsuccessful. Primiani Dep. Tr. 73:17–76:5.

## D. The Pending Action and Motions

Following his accident, on September 30, 2009, plaintiff served a notice of claim on the City. Compl. ¶ 28. Thereafter, on February 1, 2010, plaintiff commenced this action. Following multiple amendments to plaintiff's original complaint, the addition and dismissal of a few parties from the case, and the introduction of numerous cross-claims between co-defendants, on July 8, 2011, the City, FJS, and Baroco jointly moved for summary judgment. On July 12, 2011, Manetta independently moved for summary judgment. On February 16, 2012, we heard oral argument from counsel for plaintiff and the moving defendants.

## III. Discussion

### A. Standard of Review

A motion for summary judgment is appropriately granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In this context, "[a] fact is 'material' when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir.2007) (internal quotation marks and citations omitted). "In assessing the record to determine whether there is [such] a genuine issue [of material fact] to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir.2010) (citing *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). On a motion for summary judgment, "[t]he moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir.2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Where that burden is carried, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts ... and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly and Co.*, 654 F.3d 347, 358 (2d Cir.2011) (internal quotation marks and citations omitted).

### B. Negligence Claim

■ In this diversity case, we "apply state substantive law and federal procedural law." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). The parties cite exclusively to the substantive law of New York, and we agree that it governs. "To establish a prima facie case of negligence under New York law, 'a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir.2006) (quoting *Solomon ex rel. Solomon v. City of New York*, 66 N.Y.2d 1026, 1027, 499 N.Y.S.2d 392, 392, 489 N.E.2d 1294 (1985)).

### 1. Landowner Liability: The City

■ It is well established "that ... landowners [in New York] owe people on their property a duty of reasonable care under the circumstances to maintain their

property in a safe condition." *Tagle v. Jakob*, 97 N.Y.2d 165, 168, 737 N.Y.S.2d 331, 763 N.E.2d 107 (2001). This principle, however, applies with a substantial caveat to the City and the other municipalities in the State of New York that have partially shielded themselves from liability through locally enacted laws. Pursuant to New York City Administrative Code § 7–201(c)(2), otherwise known as the Pothole Law:

> No civil action shall be maintained against the city for damage to property or injury to person or death sustained in consequence of any street, highway, bridge, wharf, culvert, sidewalk or crosswalk, or any part or portion of any of the foregoing including any encumbrances thereon or attachments thereto, being out of repair, unsafe, dangerous or obstructed, unless [1] it appears that written notice of the defective, unsafe, dangerous or obstructed condition, was actually given to the commissioner of transportation or any person or department authorized by the commissioner to receive such notice, or [2] where there was previous injury to person or property as a result of the existence of the defective, unsafe, dangerous or obstructed condition, and written notice thereof was given to a city agency, or [3] there was written acknowledgement from the city of the defective, unsafe, dangerous or obstructed condition, and there was a failure or neglect within fifteen days after the receipt of such notice to repair or remove the defect, danger or obstruction complained of, or the place otherwise made reasonably safe.

N.Y. City Admin. Code § 7–201(c)(2). Plaintiffs bear the burden of pleading and proving that one of these three exceptions applies. *See Kansas v. Empire City Subway Co.*, 692 F.Supp.2d 316, 321 (S.D.N.Y. 2010) (citing *Katz v. City of New York*, 87 N.Y.2d 241, 243, 638 N.Y.S.2d 593, 661 N.E.2d 1374 (1995)). On the record before us, there is no evidence that the City received the prior written notice necessary to satisfy the first or second of these exceptions. While on several occasions members of the public made telephone calls to allege certain defects possibly relating to the catch basin at the northwest corner on 77th Street, " 'a verbal complaint written down as a telephone message ... does not satisfy the prior written notice requirement.' " *Rothstein v. City of New York*, No. 09 Civ. 5888(LTS)(HBP), 2011 WL 3296205, at *6 (S.D.N.Y., June 15, 2011) (Peck, Mag. J.) (quoting *Cenname v. Town of Smithtown*, 303 A.D.2d 351, 351–52, 755 N.Y.S.2d 651, 651 (2d Dep't 2003)). Therefore the question is whether the public records of DEP qualify as "written acknowledgements" pursuant to the third of the exceptions listed in § 7–201(c)(2).[10]

In *Bruni v. City of New York*, 2 N.Y.3d 319, 325, 778 N.Y.S.2d 757, 811 N.E.2d 19 (2004), the New York Court of Appeals addressed this very same question in a case that similarly involved DEP but presented critically different facts, holding that "a written statement showing that the city agency responsible for repairing a condition had first-hand knowledge both of the existence and the dangerous nature of the condition is an 'acknowledgement' sufficient to satisfy the Pothole Law." In *Bruni*, as in this case, DEP was alerted through a telephone call to a potential issue involving a catch basin that subse-

---

**10.** While the New York Court of Appeals has recognized two exceptions to the application of prior notice laws "where the locality created the defect or hazard through an affirmative act of negligence and where a special use confers a special benefit upon the locality," neither of these exceptions applies in this case. *Oboler v. City of New York*, 8 N.Y.3d 888, 889, 832 N.Y.S.2d 871, 864 N.E.2d 1270 (2007) (internal quotation marks omitted).

quently was involved in a plaintiff's accident:

> On July 10, 1997, someone contacted the Central Complaint Bureau of the Bureau of Sewers, which is a part of DEP, about a problem at 11th Avenue and 62nd Street in Brooklyn. According to the complaint ticket generated as a result of the call, the problem was a 'c/b SUNKEN/DAMAGED/RAISED AFFECTING STREET.' 'C/B' is an abbreviation for 'catch basin,' which is essentially an open box set into the street and covered by a metal grate. Its purpose is to collect water. The maintenance of catch basins is DEP's responsibility.

2 N.Y.3d at 322, 778 N.Y.S.2d 757, 811 N.E.2d 19. In *Bruni,* as again in this case, an employee of DEP followed up on this telephone call with a visit to the site of the alleged issue where a record was created reflecting his observations:

> The DEP document reflecting the July 10 complaint was forwarded to Samuel Gomez, a Bureau of Sewers supervisor, who inspected the catch basin and adjacent area on July 18, 1997. Gomez filled out a 'Foreman's Report' in which he stated: 'Repair defective C/B unit is missing bricks on the wall stock due to caving. Loc. safe at this time.' Gomez testified that 'caving' meant 'a hole in the street.' He also testified that 'Loc. safe at this time' meant that he had set up a sawhorse and traffic cones around the hole.

*Id.* (ellipsis in original). Finding that "the documents show beyond any question that the City was aware both that there was a hole in the street and that it was dangerous," the New York Court of Appeals allowed the plaintiff's suit to proceed. *Id.* at 325, 778 N.Y.S.2d 757, 811 N.E.2d 19.

██ Here, however, plaintiff's case against the City fails because nothing in the records of DEP indicates first-hand knowledge of the dangerous nature of an observed condition. While it is arguable that the records do not even acknowledge the existence of a defective condition that could be understood to have persisted prior to plaintiff's accident, we ultimately agree with plaintiff's counsel that a dispute of fact remains as to whether the catch basin at the northwest corner on 77th Street was flushed and taking water on June 24, 2009 when employees of DEP last visited the area ahead of July 10, 2009. However, this dispute is immaterial because no recognition of danger can be imputed to employees of DEP on June 24, 2009 from the available records. Unlike in *Bruni,* the employees of DEP did not attempt to erect a barricade or take other action from which an acknowledgment of the dangerous nature of the observed condition can be inferred and none of their recorded comments expressly convey their perception of a safety concern.

### 2. Contractor Liability: FJS, Baroco, and Manetta

██ "[A] contractor generally does not owe an independent tort duty of care to a non-contracting third party." *Guzman v. Wackenhut Corp.,* 394 Fed.Appx. 801, 803 (2d Cir.2010) (citing *Espinal v. Melville Snow Contractors Inc.,* 98 N.Y.2d 136, 138–139, 746 N.Y.S.2d 120, 773 N.E.2d 485 (2002)). "However, there are three circumstances in which a duty of care to non-contracting third parties may arise out of a contractual obligation or the performance thereof: '(1) where the contracting party, in failing to exercise reasonable care in the performance of his duties, launche[s] a force or instrument of harm,' ... or, stated differently, 'negligently creates or exacerbates a dangerous condition;' ... '(2) where the plaintiff detrimentally relies on the continued performance of the contracting party's duties; and (3) where the contracting party has entirely displaced

the other party's duty to maintain the premises safely.' " *Id.* (quoting *Espinal,* 98 N.Y.2d at 140, 141–42, 746 N.Y.S.2d 120, 773 N.E.2d 485). In this case, the second and third exceptions are not applicable and no one has argued to the contrary. Therefore the question is whether a dispute as to a material fact exists as to whether FJS, Baroco, or Manetta, "while engaged affirmatively in discharging a contractual obligation, [can be said to have] create[d] an unreasonable risk of harm to others, or increase[d] that risk." *Church v. Callanan Indus., Inc.,* 99 N.Y.2d 104, 111, 752 N.Y.S.2d 254, 257, 782 N.E.2d 50 (2002).

### a. FJS

■ In his opposing papers, plaintiff suggests that FJS, the construction manager, is liable "because [it] generated construction dirt and construction debris which included cement and as[p]halt that . . . filled the [c]atch [b]asin." Pl.'s Mem. of Law in Opp'n to Defs.' Mots. for Summ. J. ("Opp'n") 9. The evidence simply does not support plaintiff's assertion. To the contrary, FJS has only admitted to periodically using a garden hose to wash down the sidewalk outside the hotel to remove "dust" sufficiently fine that it was apparently not amenable to being swept by a broom. It is true that FJS has also admitted that the water from the garden hose and hence the "dust" ran off the sidewalk into the street. It is also true that "dust" is merely another term for fine dirt and that photographs taken of the catch basin at the northwest corner on 77th Street on the date of plaintiff's accident depict an accumulation of dirt as well as other larger pieces of particulate debris, which the run off could have at least exacerbated. *See* WEBSTER'S COLLEGIATE DICTIONARY 354, 388 (11th ed. 2003) (defining "dirt" as "loose or packed soil" with a synonymous cross-reference to "earth" and "dust" as "fine particles of matter (as of earth)"). However, as plaintiff's counsel effectively acknowledged

during oral argument, there is no evidence in the record regarding the grade of 77th Street that would permit a juror to reasonably infer from the admissible evidence that water and sediment washed from the sidewalk outside the hotel would flow toward Madison Avenue as opposed to Fifth Avenue. *See, e.g.,* Oral Arg. Tr. 21:5–20. In the absence of such evidence, speculation is necessary to sustain the element of causation, and speculation is insufficient to defeat a motion for summary judgment. *See Robinson v. City of New York,* 18 A.D.3d 255, 256, 794 N.Y.S.2d 378 (1st Dep't 2005) ("[p]laintiff must demonstrate the existence of facts and conditions from which the negligence of the defendant and the causation of the accident by that negligence may be reasonably inferred" and "[t]he proof . . . must be sufficient to permit a finding of proximate cause based not upon speculation, but upon the logical inferences to be drawn from the evidence") (internal quotation marks omitted).

The fact that Primiani observed that the catch basin at the northwest corner on 77th Street was perpetually clogged does not impact our conclusion that plaintiff's negligence claim against FJS fails. In support of a contrary result, plaintiff lamely draws our attention to language in a rider to a contract between FJS and the hotel, which appears to govern the contractual relationship between FJS and its subcontractors and provides in relevant part that a "[c]oncrete contractor" must "not . . . leave sediment on the street [or] sidewalk or . . . fill drain basins." Cheriff Aff. Ex. I. *See also* Opp'n 9 ("[a]ccording to [FJS's] contract" it was "responsible for keeping the [c]atch [b]asin clear"). *First,* plaintiff's counsel relies on contractual terms that are facially inapplicable here in the absence of an implicated concrete contractor. *See* Oral Arg. Tr. 29:14–30:13. *Second,* plaintiff's counsel's position would obliterate the well-established rule that

contractual obligations, barring certain exceptions, do not give rise to duties in tort. *See Church,* 99 N.Y.2d at 112, 752 N.Y.S.2d at 258, 782 N.E.2d 50 ("[i]f liability invariably follow[ed] nonperformance of some safety-related aspect of a contract, the exception would swallow up the general rule against recovery in tort based merely upon the failure to act as promised"). Here, none of those exceptions applies to save plaintiff's negligence claim.

### b. Baroco

■ On July 9, 2009, Baroco, a subcontractor to FJS, began work on replacing the curbs along the sidewalk outside the hotel. This work along the curb on Madison Avenue did not extend past the catch basin at the northwest corner on Madison Avenue, and indeed Baroco did not possess a permit to work on 77th Street on July 9, 2009. There is thus no evidence from which to reasonably infer that Baroco either caused or exacerbated the condition leading to plaintiff's accident, and plaintiff's claim of negligence against Baroco, which plaintiff's counsel has already abandoned, and more to the point Manetta's cross claim against Baroco therefore fail as a matter of law because Baroco owed no duty of care to plaintiff. *See supra* note 2.

### c. Manetta

Unlike its contractor co-defendants, which focus solely on whether a dispute as to a material fact exists as to whether they caused or exacerbated a dangerous condition in the performance of contractual duties, Manetta, which was retained by ConEd to install electrical vaults on 77th Street, advances what can be understood as a two-pronged attack against plaintiff's negligence claim. *First,* it asserts that speculation is necessary to determine "the allegedly dangerous condition that caused [plaintiff's] accident." Manetta's Mem. of Law. in Supp. of Mot. for Summ. J. ("Manetta Br.") 7. *Second,* like FJS and Baroco,

it argues that it did not cause or exacerbate a dangerous condition such that a duty to plaintiff should be imposed on it. *See* Manetta Br. 6–15. We address these contentions in turn.

■ As to causation, under the law of New York, "[t]o establish a prima facie case of negligence, a plaintiff must show that a defendant's negligence was a substantial cause of the events which produced the injury." *Pironti v. Leary,* 42 A.D.3d 487, 489, 840 N.Y.S.2d 98, 100 (2d Dep't 2007). While "[g]enerally, issues of proximate cause are to be decided by the jury … in certain instances, 'where only one conclusion may be drawn from the established facts,' the question of proximate cause may be decided as a matter of law." *Id.* (quoting *Derdiarian v. Felix Contracting Corp.,* 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 169, 414 N.E.2d 666 (1980)). It is well established that "there may be more than one proximate cause of an accident." *Scala v. Scala,* 31 A.D.3d 423, 424–25, 818 N.Y.S.2d 151, 152 (2d Dep't 2006) (citing *Forte v. City of Albany,* 279 N.Y. 416, 422, 18 N.E.2d 643 (1939)). Here, assuming *arguendo* that its negligence caused or exacerbated the accumulation of dirt and debris over the catch basin at the northwest corner on 77th Street, Manetta argues that plaintiff has nonetheless failed to carry his burden of showing that the dirt and debris were a substantial cause of his initial fall.

■ We disagree. At his deposition, plaintiff testified (1) that he initially stepped off from the curb with his left foot approximately eighteen inches from the western boundary of the crosswalk; (2) that his left foot landed in a depressed area approximately four to five inches below the level of the road with "a very uneven surface"; (3) that he "hit some soft material" and possibly a stone, though he cannot be certain, with his left foot and

that his left ankle thereafter twisted beneath him causing him to fall; (4) that having regained consciousness after his second fall, he sat on the curb in the approximate location where he had earlier stepped off it—two feet from the western boundary of the crosswalk; and (5) that sitting in this position, his feet rested in a depression roughly two feet by two feet in dimension filled with dirt and debris. In addition, plaintiff's brother-in-law swears that he witnessed plaintiff step into this depressed area, which he described as "caked with dirt, asphalt[,] and cement."

In his opposing papers, plaintiff asserts that two aspects of the catch basin at the northwest corner on 77th Street caused his accident: the fact that it was "below-grade" and "caked with dirt and ... debris." Opp'n 7–8. It is not necessary for plaintiff to choose between these possible causes, only the latter of which is possibly attributable to Manetta on the record before us. It is true that plaintiff has conveyed his uncertainty as to where precisely within the depressed area his left foot landed and on what in particular it landed. With that said, direct and circumstantial evidence supports the inference that plaintiff stepped into the depressed area, and he has also testified that his left foot hit "some soft material" before he fell. Drawing all reasonable inferences in his favor, as we must at this stage, we find that plaintiff has met his burden of establishing that the "very uneven surface" of the catch basin was a substantial cause of his injuries. *See Seelinger v. Town of Middletown*, 79 A.D.3d 1227, 1229–1230, 913 N.Y.S.2d 376, 379 (3d Dep't 2010) (observing "while ... plaintiff testified that he did not know what caused him to fall ... plaintiff clarifies ... that prior to the fall, he was standing next to the broken concrete abutment [and that a]fter he fell, [he] landed between the concrete abutment and the dumpster 'at the exact area where the concrete wall was broken and missing' "

and further noting "[p]hotographs of the concrete abutment depict a broken and deteriorated condition where plaintiff would have been standing" before concluding "[f]rom this evidence, a jury could logically infer that plaintiff fell because of the broken condition of the concrete abutment, and his failure to identify the cause of his fall was not fatal to his claim").

Thus, we turn to Manetta's second argument that it did not cause or exacerbate the accumulation of dirt and debris over the catch basin at the northwest corner on 77th Street. It is well established that circumstantial evidence, which "consists of proof of collateral facts from which the fact or facts in issue may indirectly be established," *Delacy v. Ettrich*, 217 A.D.2d 838, 839, 629 N.Y.S.2d 521, 523 (3d Dep't 1995) (internal quotation marks omitted), can alone support a *prima facie* case of negligence and in particular the element of proximate cause able to withstand a defendant's motion for summary judgment. *See, e.g., Torres v. City of New York*, 83 A.D.3d 577, 922 N.Y.S.2d 40, 41 (1st Dep't 2011) ("[the] court erred in granting summary judgment to [defendant] because the circumstantial evidence linking [defendant] to the alleged hazardous condition is sufficient to preclude summary judgment"). Such " '[c]ircumstantial evidence is sufficient if it supports the inference of causation or of negligence even though it does not negative the existence of remote possibilities that the injury was not caused by the defendant or that the defendant was not negligent. It is enough that he [plaintiff] shows facts and conditions from which the negligence of the defendant and the causation of the accident by that negligence may be reasonably inferred.' " *Spett v. President Monroe Bldg. & Mfg. Corp.*, 19 N.Y.2d 203, 205, 278 N.Y.S.2d 826, 225 N.E.2d 527 (1967) (quoting *Dillon v. Rockaway Beach Hosp.*, 284 N.Y. 176, 179, 30 N.E.2d 373 (1940)).

Absent direct evidence as to how the dirt and debris over the catch basin at the northwest corner on 77th Street came to be there on the day of plaintiff's accident, Manetta challenges the circumstantial evidence tending to support its own liability. We agree with Manetta that the relative temporal proximity of its work in the vicinity of the northwest corner to the day of plaintiff's accident would not alone be sufficient to preclude summary judgment in this case. *See O'Keefe v. Arbon Equipment Corp.,* 399 F.Supp.2d 478, 484 (S.D.N.Y.2005) (granting summary judgment where "plaintiffs' complete reliance on the temporal proximity of the repairs to the accident" was insufficient to establish that defendant launched a force or instrument of harm). We further acknowledge, as Manetta's counsel pointed out during oral argument, that obviously Manetta did not maintain exclusive custody and control over the catch basin, which sits in a crosswalk on a public street, in the days prior to July 10, 2009. *See* Oral Arg. Tr. 36:8–18.

■ The real issue for Manetta is that dirt does not simply appear out of thin air on the streets of the Upper East Side. Unlike a puddle on the floor of a public bathroom, which might in the ordinary course of things result from any number of readily identifiable and nearby sources other than a janitor's mop, *see Doona v. OneSource Holdings, Inc.,* 680 F.Supp.2d 394, 403 (E.D.N.Y.2010) ("there is no evidence that [defendant] either created (negligently or otherwise) the puddle of water on the floor, or exacerbated it in some way so as to render it more dangerous to the restroom patrons"), a deposit of dirt in the street immediately beside Madison Avenue does not predictably accumulate from everyday events. Were another source of the dirt aside from the excavation and backfilling performed by Manetta readily apparent in the record, then the circumstantial evidence against Manetta would be dramatically undermined. *See Montas v.*

*JJC Const., Corp.,* 92 A.D.3d 559, 561, 939 N.Y.S.2d 354 (1st Dep't 2012) (affirming grant of directed verdict for defendants where "the facts show that it is just as likely that the accident was caused by debris from the pointing project as by debris from the roadway project, and any determination by the trier of fact as to the cause of the accident would be based upon sheer speculation"). However, Manetta has only identified FJS and Baroco pursuant to the latter's work in replacing the curb as possible other targets at whom the " 'the finger of blame' " might be pointed. *See* Manetta Br. 15–16. As we have found, no reasonable inference can support the conclusion that FJS and Baroco caused the accumulation of dirt and debris through the latter's work performed on July 9, 2009.

On the other hand, Manetta is admittedly working with significant quantities of dirt in the general vicinity of the northwest corner on a nearly daily basis throughout the weeks preceding plaintiff's accident. It is true that both of the deposed eye-witnesses to the work performed by Manetta testified that at those times that they were present they did not see any employees of Manetta sweep dirt toward the catch basin and that clean-up procedures were carefully followed. While it is tempting to point to the "heavy rain" on June 18, 2009 as a possible means by which uncollected dirt might have been carried to the catch basin, we can no more guess at the grade of 77th Street in plaintiff's case against Manetta than we can in plaintiff's case against FJS. However, on June 29, 2009, Manetta is alleged to have excavated between a mere five and fifteen feet from the catch basin. This particular excavation moreover occurred after the date on which employees of DEP last visited the northwest corner and so its weight as circumstantial evidence is not conditioned by any dispute as to whether or not

the catch basin was earlier hydrant flushed on June 24, 2009. Even if the catch basin was hydrant flushed, then dirt from the nearby excavation could have accumulated afterwards. In light of the physical and temporal proximity of this excavation to the location and date of plaintiff's accident and the critical absence of another explanation for the dirt over the catch basin, a jury could reasonably infer that Manetta caused a condition contributing to plaintiff's injury. Thus a dispute as to a material fact persists that precludes awarding summary judgment.

## IV. Conclusion

For the reasons stated above, the City, FJS, and Baroco's motion is granted and Manetta's motion is denied. Plaintiff, Manetta, and ConEd are directed to appear in Courtroom 21A on April 19, 2012 at 3:15 p.m. for a conference to address matters going forward.